# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

PIPER A. ROUNTREE,        )
        Plaintiff,       )       **CASE NO. 7:18CV00567**
                 )
**v.**                     )       **MEMORANDUM OPINION**
                 )
**ERIC ALDRIDGE, <u>ET</u> <u>AL.</u>,**    )       **By:  Hon. Glen E. Conrad**
        Defendants.    )       **Senior United States District Judge**

The pro se plaintiff, Piper A. Rountree, is a Virginia Department of Corrections ("VDOC") inmate housed at Fluvanna Correctional Center for Women ("Fluvanna").  Rountree asserts that she is suing VDOC officials and employees Eric Aldridge, Harold Clarke, A. David Robinson, Jeffrey Dillman, Melissa Welch, Charlene Davis, George Hinkle and J. Fleming (collectively, "defendants") under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") 42 U.S.C. §§ 2000cc, <u>et</u> <u>seq.</u>, for alleged violations of her rights under the First Amendment and RLUIPA to freely exercise her religion – Buddhism.  The matter is before the court on the defendants' motion for summary judgment, ECF No. 24 ("motion").  After review of the record, the court concludes that the motion must be granted in part and denied in part.

## I.  BACKGROUND.

### A.  Claims and Motions.

Liberally construed,[1] Rountree alleges the following claims in this lawsuit—that the defendants have violated her right to freely exercise her religion by denying or delaying her possession of certain religious items or denying her requested practices:  (1) religious texts, (2) a

---

[1] Rountree's complaint consists of a long narrative of difficulties she and other followers of Buddhism at Fluvanna have had with various aspects of their religious practice.  The complaint does not include a clear delineation of the particular claims Rountree is attempting to assert.  Accordingly, the defendants and the court have been forced to decipher the claims, as listed and addressed herein.

clock, (3) mala beads, (4) observance of three Buddhist holidays, (5) in-cell possession of a yoga mat for individual use, (6) noncaffeinated tea, (7) a bell or gong, (8) seven offering bowls, (9) a "Zhen" shawl, (10) a DVD player with a remote, (11) a proper Vesek holiday event, and (12) an appropriate Buddhist group meeting time.[2]  The defendants argue that summary judgment should be entered in their favor on Rountree's claims for a number of reasons, including failure to exhaust administrative remedies before filing suit and qualified immunity.  The court stayed discovery on the merits of Rountree's claims until it could consider these threshold issues.  Rountree has responded to the defendants' motion, see ECF Nos. 44, 45, and 50, making it ripe for consideration.

### B.  Rountree's Evidence.

While Rountree alleges in the introductory paragraph of her complaint that the defendants' actions had violated her rights under the First and Fourteenth Amendments and RLUIPA, the entirety of the 49-page complaint lists numerous actions taken on numerous dates, often by unspecified "defendants" or by nonparties to this case, with little explanation of how these actions violated any of the plaintiff's specific rights.  In her complaint, which is signed under penalty of perjury, Rountree states that she is of the Buddhist faith, which strongly emphasizes maintaining a daily regimen of meditating, studying, living and practicing Buddhist tenets, and yoga.  See Compl. 12, ECF No. 1.  She states:

> [I]t is of paramount importance that these practices are adhered to on a daily rather that a weekly or sporadic basis.  Since the point of the practices is to create or maintain an optimally healthy mindset, physical state, and habits, only daily and repeated practice will create and maintain the optimal health and mindset sought. . . . Thus, the sincere Buddhist's lifestyle becomes one of constant and daily

---

[2] Rountree also complains about items of her outgoing and incoming legal mail being damaged and items being lost.  See Compl. ¶¶ 92-95, ECF No. 1.  Her conclusory assertions that the defendants somehow orchestrated the damage to prevent her from obtaining legal representation are not based on personal knowledge, and thus are insufficient to state an actionable claim.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that "naked assertions devoid of further factual enhancement" are insufficient to support actionable claim).  Moreover, the evidence in the record indicates that the damage likely occurred at times when the mail items were not at Fluvanna.  The court will summarily dismiss Rountree's legal mail claims without further discussion, pursuant to 28 U.S.C. § 1915A(b)(1).

repetition of its positive habits and practices.  This is [Rountree's] sincerely held religious practice and belief.

Id.

From January to August of 2016, the chaplain denied Rountree and her Buddhist group members access to donated copies of "The Basics of Buddhism."  Id. at 13; Resp. Opp'n Ex. 2, Henderson Aff. ¶ 15, ECF No. 44-3.  Rountree claims that without these religious texts, she was "denied a significant aspect of her religious belief, which substantially impaired her religious practice."  Compl. at 13.  She alleges that she raised this complaint to "the defendants."  Id.  They supported the Chaplain's decision, however, to withhold donated religious texts from new attendees until they had regularly attended Buddhist group services for six months.  Id. at 30.  She states that having religious texts available to all members attending the Buddhist group meetings is a significant aspect of their religious practice, since group readings and text discussions are a regular part of Buddhist practices.  Id.

Rountree also complains that at some point, the clock was removed from the room where the Buddhist group met, which "significantly interfered with the arrangement of the group's time, often causing it to run late."  Id. at 14.  No one in the group owned a watch, and officers refused Rountree's request to bring a small clock to the meeting.  "Without a means to keep time, the ability to sufficiently relax in a deep meditation state [is] interfered with since one is constantly wondering what time it is without a timer.  The sincere practice requires a means to time the meditation" to fit within the one-hour allotted time slot.  Id.

On March 28, 2017, the Buddhist group meeting was moved from Sunday afternoons to Tuesday evenings from 6:30 to 8:30 p.m.  Id. at 15.  After the move, the Buddhists were often not called on time to their meeting, often leaving them with little more than one hour of their time.  Id. at 15.  Rountree complains that moving the meetings to Tuesday evenings caused her and other

Buddhists not to be able to get to bed until about 10 p.m., which allowed only five to six hours of sleep before getting up to meditate/pray between 3:00 and 6:00 a.m.  Id. at 16.  Rountree also claims that she was unable to continue her studies and work, which were part of her prison annual review requirements, because she was getting too exhausted to continue both evening service attendance and her daytime work and studies.  Id.  The meeting time change also required a choice between getting up early to pray and meditate or attending the weekly meetings, both of which are precepts of her faith.  Id. at 25.

According to Rountree, the Buddhists at Fluvanna had met successfully from about 2008 to 2016 without a volunteer to supervise their weekend meetings; instead, the group was led by accredited inmates who had experience and training to teach and lead small groups.  Id. at 18.  The weekend time slot did not conflict with other inmate activities, such as work, school, programming, sleep, and medical needs.  Then, prison officials began enforcing a requirement that any faith group without a volunteer meeting supervisor had to move their meeting time to weekdays, while other religious groups with volunteer supervisors, such as Protestants, were allowed to continue meeting on the weekends.  Id. at 18.  Rountree says that the weekday evening time period assigned for Buddhist meetings was "evil," because the participants were too tired at these hours to engage in intense mental work, such as meditation.  Id. at 19, 31.  She also complains that Buddhist meetings scheduled for Tuesdays were "repeatedly and consistently cancelled."  Id. at 32.  Even after the group found volunteers to supervise Buddhist meetings, prison officials failed to reschedule those meetings to Sundays.  Id. at 21.  Moreover, starting in 2017, the inmate leaders of all faith groups, other than Protestants, were no longer allowed extra time to set up before group religious meetings.  Id. at 20.  Rountree contends that these actions promoted the Protestant faith over other faiths.  Id. at 22.

Rountree alleges that she was denied access to the prison's administrative remedies procedure when her appeals were denied for not being underlined received by the Regional Ombudsman within five days of intake rejection or unfavorable Level I decisions. She contends that under the "mail box rule," the appeal should be considered filed as of the date when the inmate mailed the appeal. Id. at 29.

In June 2017, prison officials ordered the Buddhists to get rid of two of their boxes of religious materials that were stored in the chaplain's closet. Id. at 27. When Rountree requested that the chaplain replace the discarded items, the chaplain said that she did not have enough storage space to allow them to be replaced. Id. at 27.

According to Rountree, reading Buddhist texts is a significant part of her faith's practice. Id. at 28. Rountree requested more classes and programs for Buddhists, but was told that she would not be allowed to lead them or to obtain presenters or volunteers to run such programs. Id. The defendants also refused "to appoint volunteers" to help run classes for the Buddhists. Id. at 29. Yet, the chaplains at Fluvanna allocated volunteers and time to primarily support and run Protestant classes. Id. at 28.

Rountree's sincerely held Buddhist faith requires her to use prayer beads, called mala beads. They consist of 108 beads about 31 inches in length that a Buddhist wears around her wrist to remind her of dedication to her actions, speech, and thoughts. Id. at 29. Mala beads also are used for meditation. Id. at 29. Sets of mala beads were donated to the chaplain for use by inmates, but were withheld from inmates until they had attended the Buddhist group meetings for at least six months. Id. at 29. Rountree contends that the denial of the mala beads substantially interfered with a sincere practice of her faith, because group practices could not be properly performed. Id. at 30.

In 2017, a number of yoga mats that had been donated for use by the Buddhist group disappeared from the chaplain's closet where they were stored. The Buddhist group was then forced to use mats designated for recreational yoga classes. The "chaplain scribbled all over the . . . mats . . . desecrating them for Buddhist use."[3] Id. at 31.

In September 2017, Rountree made a request that prison officials permit seven additional Buddhist practices: honoring the hours between 3:00 a.m. and 6:00 a.m. as formal meditation/prayer times for Buddhists; permitting Buddhists' walking and pacing during the daytime; allowing Buddhists instructional material in the form of books, DVDs, magazines, journals, sacred full-color images, and in-person talks given by higher level teachers who have completed Mahayana training with a recognized Zen or Tibetan Lineage; allowing Buddhists no less than three weekly services/classes each week, no less than 1.5 hours in length each, at times separate from each other; providing main services and instruction times during the daytime at an unobstructed time; and requiring that primary teachers/instructors, whether inmate or not, be of Mahayan level or greater. Id. at 32-33. Rountree also requested that Buddhists be allowed ten additional personal faith objects: mala beads in various colors; yoga mats for daily group and individual use in cells; prayer rugs that displayed Buddhist (not Muslim) motifs; colored images of teachers, including the Dalai Lame, the Seventh Dzogchen Ponlop Rinpoche, the Karmapa, metaphorical "deities," and metaphorical and actual Buddhas; a small two-inch bell and striker; seven small offering containers—either plastic cups or traditional silver bowls; herbal teas such as jasmine or chamomile for daily in-room ceremonies; a Buddhist wrap or shawl, called a Zhen, in either Tibetan red or Tibetan red and white; a clock or timer for both individual and group

---

[3] The Chaplain's response to Rountree's Informal Complaint on this issue indicated that to ensure a sufficient number of mats were available for the Buddhist group services, the Chaplain had written on each mat that it was the property of the Buddhist fellowship and was not to be removed from the area. Add. Evid. 42, ECF No. 45-3.

practices; and a DVD/video/CD player with a TV monitor and a remote for use for group viewing in classes and services.  Id. at 33.  Rountree also requested accommodation of three Buddhist holidays:  Buddha Day, with a special vegetarian group meal, celebrated in a manner comparable to Christmas, Thanksgiving, or Ramadan; Bodhi Day, celebrated in a manner comparable to Christmas, Thanksgiving, or Ramadan; and Mett Day, celebrated on July 27.  Id.  She asked that these holidays be recognized with notices, announcements, and other support as is afforded all Protestant events.  Id.  She submitted this request for approval of practices and religious items by the Faith Review Committee ("FRC"), and the FRC denied the request, even though similar practices and tools were allegedly allowed to other faith groups.  Id. at 34.

Rountree claims that denial of these tools and practices significantly interfered with a sincere practice of her Buddhist faith.  Id. at 35.  Denial of the daily use of an individual yoga mat substantially burdened the practice of her sincerely held religious beliefs, because she could not perform the complete set of yoga postures with correct alignment and without pain and injury, and could not practice and maintain required breathing, mind focus, and control.  Id. at 35.  Rountree states that avowed Buddhists must undertake a conscious dedication to take care of their health to the best of their abilities, including practicing yoga.  Id. at 35.  She alleges that her sincerely held religious beliefs include the daily practice of yoga asanas, the physical posture of yoga taken for spiritual and meditative purpose, which usually takes two hours to perform.  Id. at 35.  She insists that yoga mats are required to practice yoga safely and correctly.  Id. at 36.

Rountree also claims that herbal teas are necessary to practice morning tea ceremonies.  Id. at 37.  Such ceremonies are performed only with noncaffeinated teas, because Buddhists' lifestyle and practices are rooted in good health.  Id. at 37.

Rountree claims that multicolored mala beads are needed to harmonize the individual's chakras and promote healing. Id. at 37. Prison officials' decision to limit mala beads to one color requires them to be specially made for inmate use only, since they are not mass produced in only one color. Id. at 37. Making mala beads accessible for all inmates in their approved chakra colors would provide the Buddhists an important and significant practice, appropriate to their faith. Id. at 37. According to Rountree, multicolored prayer beads are available to Catholics and Muslims. Id. at 37-38.

Rountree states that her worship requires use of colored images sacred to her faith to develop meditation skills and to receive blessings from the lineage. Id. at 38. She explains that she needs a bell or "gonger," because, as a Buddhist, she is required to start each practice with a chime that denotes a form of heavenly music, played in gratitude and for purification, and the tonal sounds harmonize everything to purification. Id. at 38. She needs the offering bowls, because she is required to daily acknowledge, honor, and share food and drink with all ancestors and others with whom the teachers direct—a vitally important practice for mind training in selflessness. Id. at 38. As a Tibetan Buddhist monastic, Rountree says she is required to wear a prayer shawl to honor her teacher and promote dedication to her practice. Id. at 38-39. She also says that a DVD/video/CD player with a remote is necessary to navigate many of the Buddhist teaching videos. Id. at 39.

In May 2018, the chaplain had agreed that a special service and a meal would be held to celebrate Vesek (also known as Buddha Day), but no special service occurred. Id. at 40. Rountree says that a few Buddhists were given impromptu bag lunches consisting of boiled eggs and carrot sticks. Id. at 40. A special speaker headed to the service was denied entry to the prison. Id. at 41.

C.  Defendants' Evidence of Religious Accommodations.

In support of the motion for summary judgment, the defendants provide an affidavit from E. Aldridge, Warden of Fluvanna, about accommodations of inmate religious practices.  The Buddhist religious groups at Fluvanna currently meet on Sundays from 2:00 to 4:00 p.m.  Mem. Supp. Mot. Summ. J. Aldridge Aff. 2, ECF No. 28.  Around May 1, 2019, the weekly meetings were moved from Tuesdays to Sundays, based on room and volunteer availability.  Id.  A clock is now provided in the room regularly used by the Buddhists for their weekly meetings, and watches are available for purchase from the prison commissary.  Id.  One noncaffeinated beverage is also available for purchase from the prison commissary.  Id.  According to Aldridge, if Rountree would like additional items available for purchase from the prison commissary, she must make a request to the Commissary Review Committee ("CRC"), which meets once per quarter to review offender requests for additional items.  Id.  Aldridge is a member of the CRC, which had not yet received any request from Rountree for noncaffeinated teas to be added to the list of available products to be purchased from the commissary.  Id.

Aldridge states that Rountree's desire to have a metal bell and set of brass bowls for her personal and daily use in her cell presents security and safety risks.  Id.  Metal items are not generally allowed inside of a prison environment, because metal can conduct electricity and heat, and, depending on malleability, can be bent or molded into shapes that could be used as weapons. Id. at 2-3.  Items that conduct electricity and heat can be used to start fires or injure other persons or property.  Id. at 3.  Because of these risks, the bell used by Buddhists during their weekly group meetings is secured in the Chaplain's office when it is not in use.  Id. at 3.  Aldridge believes it would not be safe to permit inmates to possess property made of metal, such as a bell or bowls, for personal use in their cells.  Id. at 3.

Aldridge also states that inmates at Fluvanna are housed in double cells in which two offenders must share common space; because of this setting, inmates may possess in their cells only limited numbers of property items, such as clothing, books, papers, and food.  Id. at 3.  To allow Rountree to add additional personal property to her cell, Aldridge says, would impose a burden upon staff and other inmates by altering uniformity.  Id. at 3.  One of the ways security is maintained in a prison is through uniformity in property and appearance, which makes altered property and contraband easier to detect.  Id. at 3-4.  Adding nonuniform items to an inmate's property makes searching for and detecting unauthorized items more difficult for staff  and increases the risk that items could be altered or concealed inside of unfamiliar items, creating a security risk.  Id. at 4.

Aldridge advises that if Rountree was permitted to obtain bowls and a bell for her personal use in her cell, then, so would other offenders, and this lack of uniformity would multiply, making searches and detection of prohibited items exponentially more difficult.  Id. at 4.  It also would increase the amount of personal property in Rountree's cell and could infringe upon the use of space by Rountree's cellmate.  Id. at 4.  As Aldridge understands the practice, the set of seven Buddhists offering bowls that Rountree wants are to be filled with water and other items and set out in a line for the day or a length of time, which would result in an unequal use of space within a cell and could cause friction between cellmates, leading to fights and the need for housing reassignments.  Id. at 4.  Aldridge also advises that ringing a bell in a cell could be disturbing or disruptive to others, increasing the risk of fights and disputes between offenders.  Id. at 5.

In his experience, Aldridge states, once one inmate requests and receives additional religious items in her cell, other inmates would soon make requests for additional religious items to be stored in their cells.  Id. at 5.  When this happens, the impact on security risks can be

substantial, with increasing difficulty in searching cells, detecting contraband, and effectively managing the limited storage space for inmates in double cells. Id. at 5.

Aldridge advises that inmates' possession of yoga mats in their personal living spaces also raises security concerns. Id. A yoga mat, measuring 24 inches wide and 68 inches long, would cover the majority of the open floor space in a cell and interfere with a cellmate's ability to access her bunk and property. Id. at 5-6. Again, this space conflict could lead to altercations or arguments between inmates. Id. at 5. Yoga mats could also be rolled up and used as weapons or wrapped around an offender's body as a shield. Id. at 6. A yoga mat weighs approximately three to four pounds and, when rolled up, creates a cylinder approximately two feet long and four to five inches in diameter. Id. Thus, a yoga mat could easily be rolled up and used as a club. Id. Given their sticky texture, these mats could also be used to give an inmate better footing and balance when physically resisting security staff. Id. The mats also could be used to block the use of pepper spray or to protect an inmate from the bite of a canine when such use is necessary to maintain order in the facility. Id. In addition, the mats could be used to hide contraband. Id. Requiring the mats to be checked in and out allows the staff to clean the mats between uses. Id. Keeping the mats in a central location and permitting inmates to access them for temporary use allows inmates to exercise their religious beliefs while also maintaining security and cleanliness at the facility. Id. This system also allows staff to limit the number of mats checked out at any one time. Id. The mats used for religious purposes must be obtained from the Chaplain's office, where they are stored separately from the mats used for recreational purposes. Id. at 6-7.

According to Aldridge, a group of approximately ten to thirteen inmates have participated in a program to train them to become yoga instructors. Id. at 7. During this program, the participants were temporarily allowed to keep the yoga mats in their cells to fulfill course

requirements. Id. When the program concluded, the participants were inadvertently allowed to keep the mats in their cells, but the mats have now been removed from the cells and secured. Id. Inmates are permitted to use the yoga mats as early as 4:30 a.m. and can use them in the day room to practice yoga, so long as they are quiet and respectful of other inmates. Id. at 8. To check out a mat, an inmate must submit her ID card to be held by staff while she uses the mat; once she returns the mat, her ID card will be returned to her. Id. This same checkout procedure is used for other communal items that could pose a security risk, such as a clothing iron. Id.

Aldridge states that the VDOC does not solicit or pay for volunteer groups from any religion to come to VDOC facilities. Id. If a volunteer group wishes to host a religious event for inmates, and the volunteer group passes the appropriate security screening, that group would not be denied the ability to host an event because of the religion it represents. Id. He says that non-Christian groups would be allowed to host events similar to those often hosted by Christian religious groups. Id. At the time Aldridge prepared his affidavit, no Buddhist volunteer had approached him about scheduling any such event. Id.

The defendants also offer the affidavit of C. Rodney, a Chaplain at Fluvanna since March 2018. Rodney states that, as part of her duties as Chaplain, she assists in coordinating donations of religious items from volunteer groups or individual volunteers, and she assists in inmate religious programming. Mem. Supp. Mot. Summ. J. Rodney Aff. 2, ECF No. 26-2. She states that on May 12, 2019, the Buddhist group's weekly meetings were moved from Tuesdays to Sundays from 2:00 to 4:00 p.m., based on room and volunteer availability. Id. She states that approximately twenty inmates regularly attend these weekly Buddhist meetings. Id.

According to Rodney's understanding, mala beads are sometimes used in a Buddhist's meditation practice. Id. Inmates may purchase mala beads from the prison commissary at any

time an inmate places a commissary order.  Id.  Some groups and individuals donate the beads to

Fluvanna for distribution to inmates.  Id.  When beads or other religious faith items are donated,

Fluvanna imposes a ninety-day waiting period for inmates who want to obtain a set of the donated

beads; during this waiting period, the inmate must be participating in the faith group whose objects

she wishes to possess.  Id.  Rodney explains that this waiting period prevents inmates from taking

the items for personal and not religious use, which could leave consistent participants of a religious

group without the access to the donated items.  Id.  The waiting period also prevents offenders

obtaining religious items for free and trading or bartering them for other items; trading or bartering

property is prohibited by the VDOC, because of the security risks it creates.  Id. at 3.  The ninety-

day waiting period is applied to all donated faith objects, regardless of their faith affiliation, but it

does not apply to religious texts.  Id.  If free copies of holy texts are not available via donations

from the community, offenders may purchase texts from approved vendors.  Id. at 3.  At the time

Rodney prepared her affidavit, Fluvanna had no donated mala beads in stock, but she was in the

process of receiving more beads from donors in the community.  Id. at 3.  She also admits that at

times when groups want to donate religious items, she has to decline the donated items if Fluvanna

has a sufficient supply of that type of item or lacks storage space for more items.  Id. at 4.

Rodney states that Virginia does not permit the use of general funds from the state budget

to purchase religious items or to pay for religious programming for inmates.  Id.  To the best of

Rodney's knowledge, no taxpayer money is used to purchase any religious items or texts, or to

procure the attendance of any volunteer or religious group.  Id.  To her knowledge, funds received

from the sale of commissary items are not used to purchase religious items or to procure the

attendance of religious groups at Fluvanna.  Id.  These funds are to be used to purchase communal-

use recreation items for the benefit of inmates, such as basketballs, gym equipment, videos, and

games.  Id.  All faith-based items distributed by Fluvanna are items that have been donated by the community.  Id.  Similarly, all non-staff-member religious leaders or faith representatives who come to Fluvanna to lead religious groups of any faith are volunteers from the community; they are not paid by Fluvanna to attend and assist at religious services.  Id.

Rodney states that Fluvanna currently has a bell for use during the weekly faith meeting of Buddhists; the bell and other assorted communal religious items are stored in a locked closet, and the bell is available for check out for inmates to use in their group meetings.  Id. 4-5.  Yoga mats also are available for the Buddhist religious group members to check out for use during the group service.  Id. at 5.  Use or possession of yoga mats inside inmates' cells is not permitted for security reasons.  Id.

VDOC Operating Procedure ("OP") 841.3 governs the supervision of inmates during group religious meetings.  Id.  According to Rodney, the OP requires that religious activities be visually observed, depending on the security level of the facility.  Id.  Fluvanna houses a wide range of female inmates with varying security level classifications.  Id.  The current practice at Fluvanna is to permit inmate religious group meetings as long as there is a staff member or an experienced volunteer in the room with the inmates who are meeting. Id.  This OP does not require the presence of a community volunteer in order for inmates to hold a religious meeting, but if no spiritual leader or volunteer is available, the inmates may meet under the general supervision of trained and authorized staff as approved by the Facility Unit Head.  Id.  In addition, informal religious discussions in leisure areas are not prohibited, so long as the group does not disrupt other inmates authorized to use the same area.  Id.

## II. DISCUSSION.

### A. The Summary Judgment Standard.

The defendants have moved for summary judgment to be entered in their favor. They argue that Rountree's complaints do not rise to the level of a substantial burden on the free exercise of her religious beliefs, and that the limitations on her religious activities are the least restrictive means to achieve the compelling governmental interest of maintaining security in a prison facility. They also argue that Rountree failed to exhaust her administrative remedies as to some issues before filing suit and that she has failed to allege adequate levels of personal involvement on behalf of some named defendants. Finally, they argue that they are entitled to qualified immunity on Rountree's claims for monetary damages under the First Amendment and that she cannot be awarded monetary damages on her RLUIPA claims. Rountree has responded to these threshold issues, and the court finds the motion to be ripe for consideration.[4]

The standard of review for a motion for summary judgment is well-settled. The court shall grant summary judgment when the pleadings, discovery responses, and record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuinely disputed material fact exists if the evidence shows "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. A court shall view the facts and reasonable inferences from the facts

---

[4] Rountree has complained that she should be allowed additional discovery before the court rules on the defendants' summary judgment motion. She is not entitled to discovery before the court addresses the qualified immunity defense, however, and she has completed discovery as to the exhaustion defense.

in the light most favorable to the nonmovant when ruling on a motion for summary judgment.[5] <u>Id.</u> at 255.

To be successful, a summary judgment movant must demonstrate that "there is an absence of evidence to support the non-moving party's case and . . . that the evidence is so one-sided that one party must prevail as a matter of law." <u>Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.</u>, 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmovant may not rest on the mere allegations or denials of the pleadings. <u>See</u> <u>Oliver v. Va. Dep't of Corrs.</u>, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing Fed. R. Civ. P. 56(e)). Instead, the nonmovant must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. <u>See</u> <u>Anderson</u>, 477 U.S. at 256–57.

B. Initial Matters.

Rountree concedes that two of the issues raised in her complaint are now moot and should be dismissed as such. She states that officials have provided a clock and a DVD player, as she requested, for use during the weekly Buddhist religious gathering. <u>See</u> Resp. Opp'n 27, ECF No. 44. Therefore, claims (2) and (10) will be dismissed as moot without further discussion.

Also, some of Rountree's claims for monetary damages fail at the outset. The defendants are protected by immunity against damage claims for actions taken in their official capacities. <u>See</u> <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989). Moreover, Rountree cannot recover monetary damages under RLUIPA for any of the defendants' alleged actions. <u>See</u>, <u>e.g.</u>, <u>Sossamon v. Texas</u>, 563 U.S. 277, 285-86 (2011) (finding damages not recoverable against defendants in their official capacities under RLUIPA); <u>Rendelman v. Rouse</u>, 569 F.3d 182, 189 (4th Cir. 2009)

---

[5] The court has omitted internal quotation marks, alterations, or citations here and elsewhere throughout this memorandum opinion, unless otherwise noted.

(finding no RLUIPA claim for damages available against defendants in their individual capacities).[6]  Therefore, the court will grant summary judgment for the defendants on all claims for monetary damages against them in their official capacities and on the claims for monetary damages under RLUIPA.  This finding does not affect Rountree's claims for injunctive relief and her constitutional claims for damages under § 1983, however.

The court also concludes that although Rountree alleges several respects in which she believes the Buddhist faith group at Fluvanna is treated differently than Christian groups, she has not asserted or supported an actionable claim of religious discrimination under the Equal Protection Clause of the Fourteenth Amendment.  First, her complaint clearly states that she is bringing her claims under the First Amendment and RLUIPA.  See Compl. ¶ 2, ECF No. 1.  It is well established that the Fourteenth Amendment made the First Amendment applicable to the states.  See New York Times Co. v. Sullivan, 376 U.S. 254, 277 (1964).  Nowhere in her complaint does Rountree state that she is asserting her rights under the Equal Protection Clause.

Second, Rountree complains that prison officials offer preferential treatment to Protestant Christian groups by allowing volunteers to conduct classes and revivals open to all inmates of any religious faith.  Yet, she does not state facts showing that Buddhist volunteers wishing to conduct similar events for Fluvanna inmates have been turned away or that any Fluvanna official has purposefully discriminated against her and her faith group because their chosen religion is Buddhism.  See King v. Rubenstein, 825 F.3d 206, 220-21 (4th Cir. 2016) (equal protection claim requires showing that plaintiff is similarly situated to those treated differently and that different

---

[6]  These cases address the immunity question only as it pertains to RLUIPA as an exercise of congressional spending power, although the statute also invokes congressional commerce power.  See 42 U.S.C. § 2000cc-1(b).  The court is satisfied that Rountree's complaint does not present a factual basis for a claim of monetary damages under the Commerce Clause nexus of RLUIPA.  See, e.g., Rendelman, 569 F.3d at 189.

treatment resulted from purposeful discrimination by officials).  Therefore, to the extent that Rountree may be attempting to assert an equal protection claim, the court finds no factual support for such a claim and will summarily dismiss it under 28 U.S.C. § 1915A(b)(1) (allowing summary dismissal of complaint for failure to state claim upon which relief can be granted).

The court also concludes that Rountree's allegations do not state any actionable claim under the Establishment Clause of the First Amendment.  The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I, cl. 1.  In evaluating an Establishment Clause claim, a court must apply the three-prong test set forth in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971).  <u>See</u> <u>Wood v. Arnold</u>, 915 F.3d 308, 314 (4th Cir.), <u>cert. denied</u>, 140 S. Ct. 399 (2019).  Under <u>Lemon</u>, to withstand First Amendment scrutiny, "government conduct (1) must be driven in part by a secular purpose; (2) must have a primary effect that neither advances nor inhibits religion; and (3) must not excessively entangle church and State."  <u>Id.</u>  "The government violates the Establishment Clause if the challenged action fails any one of the <u>Lemon</u> factors."  <u>Id.</u>

Rountree asserts in several places in her complaint that Fluvanna officials give the Christian groups preferential treatment over other religious groups.  She does not state facts meeting the factors of the <u>Lemon</u> test, however.  It is undisputed that the VDOC spends no taxpayer funds or commissary intake monies to fund religious programming for any inmates and does not actively recruit volunteers from any religious faith.  It is also undisputed that if volunteers asked permission from prison administrators to conduct additional Buddhist classes and meetings with Fluvanna's inmate population, those volunteers would receive the same consideration that volunteers have received in setting up Christian programming for any interested inmates at the facility.  The record evidence indicates that Fluvanna officials, at the most, make space and time

arrangements for volunteer groups to present programming to inmates. The court cannot find that this involvement constitutes state entanglement with church groups or primarily advances one religion over another so as to fall afoul of the <u>Lemon</u> factors. Accordingly, the court will also summarily dismiss any attempted Establishment Clause claim under § 1915A(b)(1).

### C. Exhaustion of Administrative Remedies.

#### 1. Exhaustion Requirement.

The Prison Litigation Reform Act ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. <u>See</u> 42 U.S.C. § 1997e(a). Exhaustion is mandatory under § 1997e(a). <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 85 (2006). "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants. <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007).

The Supreme Court has also instructed that the PLRA "requires proper exhaustion." <u>Woodford</u>, 548 U.S. at 93. Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. <u>See</u> <u>id.</u> at 90. For this reason, an "untimely or otherwise procedurally defective administrative grievance" does not satisfy § 1997e(a). <u>Id.</u> at 83-84.

An inmate may escape summary judgment under § 1997e(a), if she states facts showing that the remedies under the established grievance procedure were not "available" to her. <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1858 (2016) ("An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones."). Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008).

## 2. VDOC Exhaustion Rules.

In support of their motion, the defendants have filed an Affidavit from C. Gratton, the Human Rights Advocate at Fluvanna.  See gen. Mem. Supp. Mot. Summ. J. Gratton Aff., ECF No. 26-3.  Gratton states that she is responsible for maintaining offender grievance files at Fluvanna. OP 866.1 provides the mechanism by which offenders are to resolve complaints, appeal administrative decisions, and challenge the substance of procedures.  Operating Procedure 866.1 is the written administrative remedies procedure that VDOC inmates must follow to comply with § 1997e(a).  Gratton Aff. Encl. A.  All issues are grievable except those pertaining to the policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws and regulations, and other matters beyond the control of the VDOC.

Under this procedure, an inmate with a grievance about some event or issue must first make a good faith effort to resolve her concerns informally, verbally and then in writing on an Informal Complaint form.  When an inmate's Informal Complaint is filed, she should receive a receipt and within fifteen calendar days, she should also receive a written response to the issue she raised.  If she does not receive a response within fifteen days, she may file a Regular Grievance on the issue and attach the informal complaint receipt as documentation of her attempt to resolve the issue informally.

The inmate must file a Regular Grievance within thirty days of the occurrence about which it complains.  A Regular Grievance that does not meet the filing requirements of OP 866.1 will be returned to the inmate within two working days with a note on the back of the form, stating the reason for rejection and instructions on how to remedy the problem and refile where feasible.  The inmate may appeal the intake rejection by sending the Regular Grievance to the regional ombudsman within five calendar days.  An appeal of the intake decision does not satisfy the OP's

requirement to file a properly accepted Regular Grievance as part of the exhaustion process, however.

A properly filed Regular Grievance will trigger an investigation, on which the warden or his designee will send the inmate a Level I response. If the responding official determines the grievance to be "unfounded," to exhaust available remedies, the inmate must appeal that holding to Level II, and in some cases, to Level III.

### 3. Evidence Regarding Exhaustion.

As additional evidence to her complaint, Rountree submits a copy of a Regular Grievance dated August 19, 2016, on which she complained of not having had access to Buddhist books and materials for the past eight months and requesting a Buddhist Chaplain. Add. Evid. 1, ECF No. 45-1. This Regular Grievance was rejected at intake for raising more than one issue and for expired filing period; the rejection was denied as untimely filed. Id. at 2, 4.

Gratton's review of Rountree's grievance file reflected that Rountree did not file any Regular Grievance making an individual request for the following items: noncaffeinated teas, a bell, offering bowls, or a Zhen shawl. Gratton Aff. ¶¶ 11, 12, 14, and 16, ECF No. 26-3. Rountree has not presented copies of any Regular Grievances raising these individual issues.

Rountree included these issues and others in two Informal Complaints, FCC-18-INF-02565 and FCC-18-INF-02566, both dated May 5, 2018, complaining that the FRC had denied her requests for prison officials to provide "[six] requested practices, allow [ten] practice tools and honor [three] Holy days." Id. at 5 and Encl. D. An attachment to the Informal Complaints listed the ten practice tools Rountree was requesting—mala beads, yoga mats for individual use in cells, prayer rugs with Buddhist motifs, colored images of teachers, deities and Buddhas, a bell, seven small offering containers, herbal tea, a Buddhist wrap/shawl, a clock/timer, and a DVD player with

TV monitor and remote.  Id. Encl. D.  The assistant warden responded to the Informal Complaints

on May 16, 2018, and advised Rountree that her FRC requests had been properly forwarded to the

FRC and denied, but that Fluvanna officials were not responsible for the FRC's decision.  Gratton

Aff. at 5-6; Encl. C.

Rountree then submitted two Regular Grievances, both dated May 19, 2018, attaching the

responses to Informal Complaints.  Id. at 6; Encl. D.  According to Gratton, neither grievance met

intake criteria, and neither was accepted during the intake process.  On her response dated May

26, 2018, Gratton checked the box "Grievance Filed Regarding Another Institution," namely, the

FRC.  Id. at 6.  Gratton did not assign a log number to these grievances and returned them to

Rountree.  Id. at 6.  Rountree submits evidence that she appealed at least one of the intake

decisions; the appeal (dated May 28, 2018) was marked received and rejected by the Regional

Ombudsman on June 6, 2018, as untimely filed.  Compl. Ex. 37, ECF No. 1-3.

In 2016, Rountree filed a Regular Grievance complaining about the Chaplain's instruction

that she was not allowed to use her Buddhist yoga mat for individual check-out purposes.  Gratton

Aff. at 4.  The Warden issued a Level I response on May 18, 2016, and advised Rountree that per

OP 841.3, yoga mats were stored in the recreation area.  Id.  The Warden ruled the grievance to be

unfounded, stating that yoga mats could be checked out for individual use and returned to the

designated area at the end of the day.  Id. at 4-5.  According to Gratton, records indicate that

Rountree did not appeal this grievance decision to Level II.  Id. at 5; Encl. B.[7]  Rountree contends

that she did not appeal the Warden's decision, because at that time, she was satisfied with the

outcome of checking yoga mats out for individual use.

---

[7] Gratton states that the Level I response attached to her affidavit as Enclosure B is not signed, because it was an electronic document from the VDOC CORIS computer records system.

Rountree submitted a Regular Grievance dated April 11, 2016, complaining that the Chaplain refused her access to donated mala beads authorized by OP 841.3. Id. at 6; Encl. E. Rountree asked that Fluvanna allow donated mala beads to be distributed to her and other Buddhists. Id. at 6. Gratton rejected this grievance at intake as a request for services and returned it to Rountree without assigning it a log number. Id. at 6. Rountree did not appeal the intake decision on this grievance. Id.

Rountree submitted an Informal Complaint, FCC-17-INF-05254, dated September 15, 2017, complaining that the Chaplain only gave out Buddhist mala beads to inmates who had attended Buddhist services for six months, despite the availability of the beads donated from Integral Yoga. Id. at 7; Encl. F. The Chaplain responded that offenders may purchase mala beads at any time from the commissary and that items donated to the Chaplain's office are under the care of the Chaplain. Id. The response indicated that the Chaplain's routine policy was not to distribute donated religious items, for Catholics or Buddhists, except to inmates who had regularly attended services for six months, in order to prevent nonmembers from demanding items specifically donated to a particular religious group. Id. Gratton states that Rountree did not file a Regular Grievance on this Informal Complaint. Id.

Rountree provides copies of several Regular Grievances referencing Informal Complaint FCC-17-INF-5254, however. Add. Evid. 134-52, ECF No. 45-2. On one such Regular Grievance, dated September 22, 2017, Rountree complained that the Chaplain was violating policy by withholding donated mala beads for six months for new Buddhist attendees, that mala beads were not available in the commissary, and that Rountree and other Buddhists needed them for their practice. Id. at 141. This grievance was rejected on intake on September 26, 2017, as raising more than one issue. Id. at 142. Rountree appealed this rejection, and her appeal, marked received by

the Regional Ombudsman on October 30, 2017, was rejected as not being timely filed on October 31, 2017.  Id. at 142.

Another Regular Grievance referencing Informal Complaint FCC-17-INF-5254, was dated on September 25, 2017.  Id. at 135.  Rountree complained that she could not engage in her weekly group practice, because the Chaplain was withholding mala beads for six months for new attendees.  This grievance was rejected on intake on October 23, 2017, as being repetitive and as having no effect on Rountree personally.  Id. at 136.  Rountree appealed this rejection, and the intake rejection was upheld on appeal.  A letter from the Regional Ombudsman stated that the rejection was upheld because: "The issue in the grievance is different from the issue in the informal complaint."  Id. at 134.

Rountree complained in a Regular Grievance dated September 29, 2017,[8] that "the beads are needs for me and others from the very beginning of the Buddhist practice."  Id. at 137.  This grievance was rejected on intake on October 7, 2017, because it did not affect Rountree personally.  Id. at 138.  Rountree appealed this rejection, and her appeal, marked received by the Regional Ombudsman on October 30, 2017, was rejected on October 31, 2017, as not being timely filed.  Id. at 138.

In another Regular Grievance dated September 29, 2017 and referencing Informal Complaint FCC-17-INF-5254, Rountree complained about the six-month wait for mala beads.  Id. at 139.  She stated that she suffered personally from this policy, because she could not engage in group Buddhist practice without "these group religious tools."  Id.  This grievance was rejected on intake on October 16, 2017, because it raised a group complaint or petition; the response advised

---

[8]  This Regular Grievance noted that it related to Informal Complaint FCC-17-INF-5254.  Id. at 137.

Rountree that grievances are to be submitted by individuals affected by the issue. Rountree appealed this rejection, and the intake decision was upheld on appeal. Id. at 140.

In her verified response to the defendants' motion, Rountree states that she filed an Informal Complaint and Regular Grievance regarding her request for mala beads. Resp. 12, ECF No. 50. Rountree concedes, however, that this Regular Grievance was rejected at intake on October 23, 2017. Id. She contends that she could not then file a proper grievance on this issue because the thirty-day time limit for filing a grievance expired on October 12, 2017. Id. at 13. Rountree claims that she appealed this intake decision, and the rejection was upheld on appeal.

Rountree submitted multiple grievances about the Buddhists' weekly group meeting time. On January 12, 2017, Rountree filed an Informal Complaint FCC-17-INF-00310, complaining about a posted announcement that unsupervised religious group services would be moved from the weekends to a weekday time slot. Add. Evid. 25, ECF No. 45-1. She stated that the time change would adversely affect her ability to fellowship with other Buddhists, because of conflicts with programming, school, work, medical care, and sleep. Id. In response, the Chaplain advised Rountree that bigger religious groups, such as the Protestant inmates, had volunteers to lead the meetings and needed more space, such as the gymnasium, which was not available on weekdays. Id.

Rountree provides a copy of a Regular Grievance dated January 26, 2017, on which she complained about the Buddhist weekly service being moved to weekdays. Id. at 23. This Regular Grievance was rejected on intake as being nongrievable, because it involved matters beyond the control of the VDOC, since the VDOC could not control the volunteer's schedule. Id. at 24. This intake decision was upheld on appeal. Id.

On Regular Grievance FCC-17-REG-00047, dated January 15, 2017, Rountree complained of being called out late for her Buddhist fellowship service resulting in a decrease in the time for conducting the service. Id. at 31. On Level I review, this Regular Grievance was determined to be unfounded, a decision upheld on Level II review. Id. at 28-29. The decision at Level II stated that Rountree had exhausted her administrative remedies on this issue. Id. at 29.

In June 2018, Rountree filed an Informal Complaint and then a Regular Grievance, complaining that the Buddhists' special event on May 29, 2018, for Vesek (also known as Buddha Day) was shorter than their regular meeting time and their special speaker was not allowed to enter the facility. Add. Evid. 175-180, ECF No. 45-3. The Vesek celebration was particularly unsatisfying to Rountree because a Protestant event earlier in the month had been widely publicized, lasted six hours, and included a special speaker. The Chaplain responded that the Vesek celebratory elements required by the VDOC master religious calendar are a group meal separate from other inmates and a worship service, but no special speaker is required for Vesek. Id. at 176. Rountree's grievance was ruled unfounded, and that ruling was upheld in the Level II response. Id. at 175.

4. Exhaustion Analysis.

The defendants argue that summary judgment should be entered in their favor on many of Rountree's claims because Rountree failed to exhaust her administrative remedies before filing suit. The record evidence indicates that Rountree did not properly complete all steps of the OP 866.1 procedures as to issues raised in claim (1), regarding religious texts, and claims (3) through (9), regarding mala beads, three Buddhist holidays, an in-cell yoga mat, noncaffeinated teas, a bell, offering bowls, and a Zhen shawl. Gratton Aff. at 5-6. The court will grant the defendants' motion as to these claims under § 1997(e)(a) and dismiss them without prejudice. The record evidence

indicates, however, that Rountree's claim (2), regarding the meeting time for Buddhist group services, and claim (10), regarding the Vesek celebration for Buddhists in 2018, cannot be dismissed for failure to exhaust.

As discussed, OP 866.1 requires a VDOC inmate to file a Regular Grievance that is accepted and appealed to the highest available level of appeal to fully exhaust her administrative remedies. Furthermore, appealing rejection of a grievance at intake does <u>not</u> satisfy the requirement to fully exhaust. Rountree incorrectly argues that she exhausted her administrative remedies on numerous grievances when she appealed the intake decisions rejecting her Regular Grievances. She is mistaken. As stated above, OP 866.1 requires that an inmate file a Regular Grievance that is accepted at intake and then properly appealed to the highest level available to fully exhaust.

Rountree also argues that the court should apply the "mail box rule"[9] to find that her administrative remedy appeals were filed when mailed to, rather than when received by, the Regional Ombudsman. The court declines to do so for two reasons. First, this rule has not been expanded in this circuit to apply to prison administrative remedy requests or appeals. Second, the timing of Rountree's appeals of intake rejections are of no consequence, because these appeals, even if timely filed, would not have resulted in full exhaustion.

The record evidence indicates that Rountree did not properly exhaust her claim about the chaplain refusing to distribute donated copies of <u>The Basics of Buddhism</u> for six months in 2016. Her regular grievance on this issue was rejected at intake as untimely filed and raising multiple

---

[9] The "Prison-Mailbox Rule," described in <u>Houston v. Lack</u>, 487 U.S. 266, 275 (1988), recognizes that pleadings are considered filed with the court when deposited by a prisoner for mailing to the court, rather than when received by the court.

issues.  Instead of rewriting the grievance and resubmitting it, she appealed the intake decision, but that appeal was rejected as untimely filed.  See Compl. Ex. 2, ECF No. 1-1.

The defendants' evidence is that Rountree filed no individual grievances addressing the issues of noncaffeinated teas, a shawl, offering bowls, a bell, or additional Buddhist holidays. Gratton Aff. at ¶¶ 11-12, 14-17.  Rountree's evidence does not prove otherwise.

The evidence also indicates that Rountree did not properly exhaust her administrative remedies as her claim that she was denied access to mala beads.  The evidence indicates that she filed an Informal Complaint and then Regular Grievances on this issue that were all rejected at intake.  Rountree said that her appeals of the intake decisions constituted exhaustion of administrative remedies, but that is not so.  Because it is undisputed that she did not properly file a grievance that was accepted and decided on the merits through the last level of appeal,[10] the mala beads issue was not exhausted when she filed suit.  See Woodford, 548 U.S. at 90.

Rountree also did not properly exhaust her request to keep a personal yoga mat in her cell. In 2016, she filed Regular Grievance FCC-16-REG-00025, complaining that she was not allowed to use a yoga mat for individual purposes.  Id. at 4.  The Warden responded on Level I review that yoga mats could be checked out for individual use on a daily basis, and then returned for storage in a designated common area.  No evidence in the record indicates that Rountree appealed this decision to Level II as required for full exhaustion.  Id. at 4-5.  In addition, no evidence in the record indicates that she has since filed a Regular Grievance expressly requesting to possess a yoga mat in her cell for personal use.

---

[10]  The record reflects that other Regular Grievances Rountree filed on this issue suffered a similar outcome— a rejection at intake that was upheld on appeal or never properly appealed.  See Add. Evid. 136, 138, 140, ECF No. 45-2; Gratton Aff. 6, ECF No. 26-3.

Rountree claims that she properly exhausted administrative remedies on multiple religious practices and faith items at once by filing two Regular Grievances, dated May 19, 2018; these grievances complained that the Chaplain and the FRC had denied Rountree's request as a Buddhist to allow ten practice tools, including mala beads, individual use yoga mats, tea, shawl, bowls, bell, and observance of three holy days. Both of these Regular Grievances were rejected on intake, however, because they did not complain about actions taken by anyone at Fluvanna and were not submitted to VDOC headquarters where the FRC operates. Rountree's appeals of these intake decisions were rejected as not being timely filed. Add. Evid. 84-126, ECF No. 45-3. Because Rountree never filed a proper Regular Grievance on each of these religious practice issues or pursued them for a Level II appeal response, she did not properly exhaust the issues.

All told, then, the uncontradicted evidence before the court is that Rountree did not fully exhaust her administrative remedies with regard to her claims (1) and (3) through (9), concerning religious texts, mala beads, holidays, personal yoga mats, noncaffeinated tea, offering bowls, a bell, and a shawl. Rountree has not demonstrated that the administrative remedies were unavailable to her in any way. Therefore, the court will grant the defendants' motion and enter summary judgment for failure to exhaust these claims and dismiss them without prejudice, pursuant to § 1997e(a).[11]

The court concludes, however, that Rountree has exhausted administrative remedies with respect to her claims (11) and (12), regarding the accommodation provided for the Vesek holiday

---

[11] Moreover, the record indicates that donated religious texts can now be distributed immediately to adherents of the affiliated religion; donated mala beads will be distributed to new attendees after ninety days of regular attendance of a particular religious group service; Rountree has daily access to a yoga mat for personal use; she may file a request with the Commissary Committee to add noncaffeinated teas, plastic offering bowls, and a shawl to the commissary's offerings for purchase; and the Buddhist group may check out a bell from the Chaplain's office to use during their group services. In addition, this court has previously determined that prohibiting inmates from keeping yoga mats in their cells for individual use is lawful under the First Amendment and RLUIPA. See Rountree v. Clarke, No. 7:15cv220, 2017 WL 657551 (W.D. Va. Feb. 26, 2017). Rountree's current claims for personal use of a yoga mat are nearly indistinguishable from the claims presented in her 2015 case.

celebration and the Buddhists' weekly meeting time slot. She raised inconvenience of weekday meeting times and her dissatisfaction with the Vesek events provided in Regular Grievances that were then successfully appealed through Level II. Add. Evid. 20-31, ECF No. 45-1; Add. Evid. 175-180, ECF No. 45-3. In addition, Rountree's January 26, 2017, Regular Grievance about the Buddhists' meeting time moving to a weekday was denied as nongrievable. Add. Evid. 23-24, ECF No. 45-1. Rountree cannot be barred under § 1997e(a) from suit on an issue for which the grievance procedure is unavailable. Ross, 136 S. Ct. at 1858). Accordingly, the court cannot grant summary judgment for the defendants under § 1997e(a) on these claims.

### D. Qualified Immunity.

The defendants also argue that summary judgment should be issued in their favor on the ground of qualified immunity as to Rountree's claims for monetary damages. By Order entered on August 20, 2019, ECF No. 41, the court found the defendants' qualified immunity defense to be well-taken, because it was not clearly established that failure to provide the highly particularized religious accommodations Rountree demands in this case would violate her federally protected rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For the reasons stated in that Order, the court will enter summary judgment in the defendants' favor on the ground of qualified immunity as to all claims for monetary damages. A finding of qualified immunity has no effect on Rountree's claims for injunctive relief, however.

### E. Free Exercise Claims.

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "In order to state a claim for violation of rights secured by the [First Amendment] Free Exercise Clause, an inmate, as a threshold matter, must demonstrate that: (1) he holds a

sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." Wilcox v. Brown, 877 F.3d 161, 168 (4th Cir. 2017). Under RLUIPA, "when a prison substantially burdens an inmate's exercise of religion, the prison must demonstrate that imposing the burden serves a compelling government interest and does so by the least restrictive means." Lovelace v. Lee, 472 F.3d 174, 182 (4th Cir. 2006). "[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Id. at 187 (RLUIPA context) (quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981) (First Amendment context)).

Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration," they must defer to the expertise of prison officials in crafting policies addressing those problems, such as security, discipline, and efficient use of limited resources; therefore, a prison regulation that substantially burdens inmates' religious practices is, nevertheless, "'valid if it is reasonably related to legitimate penological interests.'" Id. at 199 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). This determination turns on a four-factor test: (1) "whether there is a valid, rational connection between the prison regulation" and the asserted government interest; (2) whether Rountree was "deprived of all forms of religious exercise or [was] able to participate in other observances of [his] faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any obvious, easy alternatives to the challenged regulation." Id. at 200.

RLUIPA provides federal statutory protection of prisoners' religious exercise under a stricter legal standard: "RLUIPA prohibits [state] prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a

compelling governmental interest by the least restrictive means." Miles v. Moore, 450 F. App'x 318, 319 (4th Cir. 2011) (unpublished per curiam) (citing 42 U.S.C. § 2000cc-1(a)). If the inmate proves that there is a substantial burden on her religious practice, "the burden shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." Incumaa v. Stirling, 791 F.3d 517, 525 (4th Cir. 2016).

The defendants argue that Rountree's complaints do not rise to a substantial burden on the free exercise of her religious beliefs, and that even if they rise to this level, any limitations on Rountree's religious activities are lawful under the Turner standard and are the least restrictive means to achieve the compelling governmental interest of maintaining security in a prison facility. The court concludes, however, that Rountree's claims for injunctive relief on the remaining issues survive the defendants' current motion for summary judgment.

Rountree has presented facts on which she might persuade a fact finder that a weekday meeting time was a substantial burden on her religious practice. She was forced to choose between participating in work and programming that could support her likelihood of being granted early release or attending her religious service. Other Buddhists faced similar conflicts and not to attend, which also deprived Rountree of the ability to fellowship with them. Although the Buddhist meeting time is currently held on Sunday, no evidence in the record indicates that the time could not be switched to a weekday again, based on future developments regarding room and volunteer availability. Thus, the court cannot find that Rountree's concern over this issue is moot. See Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) ("[W]hen a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot.").

Similarly, the court concludes that Rountree's concerns about the prison's accommodations of the Buddhists' Vesek event are not moot. The Buddhist group allegedly did

not receive a special meeting time or a celebratory meal for this religious holiday in 2018, and nothing in the record indicates that the 2019 holiday event fully accommodated adherents' religious needs or that changes made will ensure that future events accomplish this purpose. Furthermore, the court recognizes that Rountree has not been given the opportunity to conduct discovery on the merits of her two remaining claims. For the stated reasons, the court will deny summary judgment on Rountree's claims (11) and (12), regarding Vesek holiday celebrations and Buddhist group services.

## III. CONCLUSION.

In conclusion, Rountree's claims (2) and (10), regarding a clock and a DVD player, will be dismissed as moot. The court will grant summary judgment for the defendants on the following claims, based on Rountree's failure to properly exhaust administrative remedies: claims (1), regarding religious texts, and claims (3) through (9), regarding mala beads, three Buddhist holidays, an in-cell yoga mat, noncaffeinated teas, a bell, offering bowls, and a Zhen shawl. The court will dismiss these claims without prejudice. The court will dismiss other attempted claims without prejudice, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief could be granted: interference with legal mail, religious discrimination under the Equal Protection Clause, and preference for one religion, in violation of the Establishment Clause. The court will also grant summary judgment as to Rountree's claims for monetary damages. The court will deny summary judgment on Rountree's claims (11) and (12), regarding Vesek holiday celebrations and the Buddhists' weekly group service time.

The court will refer these remaining matters to the magistrate judge for further proceedings, including any additional discovery and a bench trial, as no issues triable before a jury remain in the case. An appropriate order will be entered herewith. The clerk will send a copy of this

memorandum opinion and the accompanying order to the plaintiff and to counsel of record for the defendants.

**ENTERED:** this ___7th___ day of April, 2020.

_____
Senior United States District Judge